**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION IN ADMIRALTY**

| | | |
|---|---|---|
| JERRY ELLIS and KEVEN ELLIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 2:18-cv-3588-DCN |
| | ) | |
| TALL SHIPS CHARLESTON, LLC and | ) | **ORDER** |
| AMERICAN SAIL TRAINING; | ) | |
| ASSOCIATION d/b/a TALL SHIPS | ) | |
| AMERICAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The following matter is before the court on defendants American Sail Training Association d/b/a Tall Ships American ("Tall Ships American") and Tall Ships Charleston, LLC ("Tall Ships CHS")[1] (together, "defendants" or the "Tall Ships entities") motion for summary judgment, ECF No. 58. For the reasons set forth below, the court grants the motion.

## I.  BACKGROUND

This action arises out of a slip-and-fall aboard a navy vessel named the FRAGATA (ARA) LIBERTAD (the "Libertad"). The Libertad is owned and operated by the Argentine Republic ("Argentina"). Tall Ships American and its local chapter, Tall Ships CHS, organized a tall ships festival held in North Charleston, South Carolina from May 19–21, 2017. Defendants invited the Libertad to participate as one of the featured ships in the festival, and Argentina agreed to provide the Libertad.

---

[1] Defendants note that Tall Ships Charleston, LLC is a defunct corporate name, and the entity is properly identified as Tall Ships CHS. ECF No. 58-1 at 1 n.1.

In preparation for the festival, Tall Ships American and Tall Ships CHS signed an "American Sail Training Association DBA Tall Ships Challenge Port Organizer Agreement" (the "Agreement"). The Agreement referred to Tall Ships American as "Tall Ships America" and Tall Ships CHS as "Port Organizer." It provided, in part:

> 1.5    Without expense to Tall Ships America (except as specified herein) and using its own resources others may afford to it, Port Organizer agrees to organize and conduct the Port Event in the Host Port during the period of the Event Dates, the publicity for which may employ the Name. It shall be so organized and executed as to afford the optimum level of safe interaction between the citizenry of the Port, particularly its youth, with the trainees and crew of the participating vessels. Port Organizer will secure, provide for, or arrange for the availability of waterfront services and equipment, and will obtain the licenses, permits, and permissions form local officials necessary to conduct the Port Event lawfully.

ECF No. 64-2 at 6 (emphasis added). Appendix A to the Agreement further provided: "h. Tall Ships America will provide professional review for Port Organizer's public safety, security and incident management plan, and specify changes to same as may be necessary to ensure conformity with MENS and other public safety stakeholder requirements." Id. at 18.

On May 21, 2017, plaintiffs Jerry Ellis ("Ellis") and Keven Ellis (together, "plaintiffs") purchased tickets for the tall ships festival and attended it with their family. Plaintiffs visited the Libertad and stayed aboard for approximately thirty minutes. According to the complaint, when Ellis was disembarking the Libertad, he was instructed to step up onto and walk across "a painted metal bitt[2] secured to the vessel's deck" to reach the gangway. ECF No. 1, Compl. ¶ 16. Due to the low tide in North Charleston

---

[2] A "bitt," also referred to by the parties as a "bit" or "bollard," is a "post or pair of posts fixed on the deck of a ship for securing lines." Merriam Webster, "Bitt," https://www.merriam-webster.com/dictionary/bitt.

that day, the ship's gangway rested on a pier cap, causing the gangway to be several feet above the ship's deck.  ECF No. 64 at 5 (citing ECF No. 64-1, Brown Dep. at 124:9–11).  While stepping onto the bitt, Ellis slipped and fell, badly injuring his right leg.

Plaintiffs filed suit against the Tall Ships entities and Argentina on December 27, 2018, asserting claims for negligence and loss of consortium.  Compl.  On September 3, 2021, Argentina filed an unopposed motion to dismiss.  ECF No. 49.  The plaintiffs consented to the motion, and the court dismissed Argentina with prejudice on September 7, 2021.  ECF No. 50.

On December 15, 2021, defendants filed a motion for summary judgment.  ECF No. 58.  Plaintiffs filed their response in opposition on January 21, 2022, ECF No. 64, and defendants replied on January 28, 2022, ECF No. 66.  The court held a telephonic hearing on the motion on February 1, 2022.  ECF No. 68.  On February 22, 2022, plaintiffs, with leave of the court, filed a supplement addressing the applicability of certain Coast Guard standards to the Libertad.  ECF No. 64.  On February 28, 2022, defendants replied to the supplement.  ECF No. 72.  As such, the motion has been fully briefed and is now ripe for review.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### III.   DISCUSSION

Defendants move for summary judgment on each of plaintiffs' claims. Defendants first argue that under the maritime negligence laws that guide this court, plaintiffs have failed to establish a prima facie case of negligence. In the alternative, defendants argue that they did not owe a duty while plaintiffs were on the Libertad as a matter of state law. The court considers each argument in turn, ultimately finding that summary judgment is warranted in defendants' favor on either ground.

### A.  Maritime Negligence Law

First, defendants argue that as a matter of general maritime law, summary judgment is appropriate because any alleged defect or dangerous condition was open or obvious. As a preliminary matter, the court must determine what law is to be applied. As a general matter, the court agrees with defendants that plaintiffs' claims are within this court's admiralty jurisdiction and are governed by substantive admiralty law. 28 U.S.C. § 1333(1); E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986);

Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981); Nicholes v. M/V Maya, 949 F. Supp. 391, 397 (D.S.C. 1996); see also Green v. Pope & Talbott, Inc., 328 F. Supp. 71, 77 (D. Md. 1971) ("[If] the place of injury is on a ship, there is maritime jurisdiction . . . . [I]f the injured person is on the dock or wharf, or other structure equivalent to land, there is no such jurisdiction." (citing G. Robinson, Handbook of Admiralty Law in the United States § 10 (1939))).  Negligence is an actionable wrong under general maritime law. Leathers v. Blessing, 105 U.S. 626, 630 (1882).  In admiralty cases, then, a plaintiff's cause of action for negligence is to be determined under the principles of maritime negligence law rather than common law negligence.  Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 411 (1953).

"Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules."  E. River, 476 U.S. at 864.  The elements of a maritime negligence cause of action are: (1) the existence of a duty required by law that obligates a person to conform to a certain standard of conduct in order to protect another against unreasonable risks of harm; (2) a breach of the said duty by engaging in conduct that falls below the applicable standard; (3) a causal connection between the improper conduct and the resulting injury; and (4) an actual loss or injury to the plaintiff due to the improper conduct.  Schumacher v. Cooper, 850 F. Supp. 438, 447 (D.S.C. 1994).  The plaintiff has the burden of proof for each of these elements in a maritime negligence cause of action.  Id.

Under the first element, "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew."  Bubla v. Bradshaw, 795 F.2d 349, 353 (4th Cir. 1986) (citing Kermarec v. Compagnie Generale,

358 U.S. 625, 630 (1959)) (emphasis added). "Courts have also recognized that a slip owner under admiralty jurisdiction owes a duty of ordinary care toward those who use the pier." Id. (citing Casaceli v. Martech Int'l, Inc., 774 F.2d 1322, 1328, 1331 (5th Cir. 1985)). The duty of ordinary care includes "a duty to warn of harm that is reasonably foreseeable under the circumstances." Id. (citations omitted). Based on their briefs, defendants appear to concede that the court should analyze whether they were liable as the equivalent of shipowners. See ECF No. 58-1 at 11 ("Simple logic dictates that the Tall Ships festival organizers cannot have a superior duty than the Libertad to those members of the public onboard the Libertad; therefore, we reference the general negligence requirements for the Libertad (i.e., maritime negligence) as instructive for Plaintiffs' claims against Tall Ships."); ECF No. 72 at 4 ("Although Mr. Ellis'[s] fall occurred entirely aboard the Libertad, the potential liability attributable to Tall Ships is analyzed as if Tall Ships were the actual possessor of the ship upon which Plaintiff fell."). Despite this apparent concession, the court fails to comprehend why the Tall Ships entities owed a duty as shipowners. According to both the complaint and the evidence before the court, Argentina fully owned and operated the Libertad. Compl. ¶ 7; ECF No. 58-3. Furthermore, there is no evidence that the Tall Ships entities were slip owners or owners of the pier. At the hearing, defendants clarified that because maritime law does not appear to contemplate a duty owed by defendants like the Tall Ships entities, they argued that even if they were shipowners, they had no duty to warn of open and obvious dangers. However, defendants also pointed out that they argue in their briefs that under state law on premises liability, the Tall Ships entities had no duty because they did not exercise control over the Libertad.

In the absence of any response by plaintiffs on this issue, the court finds that defendants' arguments on control under premises liability are applicable under general maritime law for two reasons. First, both parties agree that "state law and state remedies can supplement maritime law . . . to the extent they are not inconsistent with it." ECF No. 64 at 9; see also ECF No. 58-1 at 14 ("Although admiralty law does not analyze the duty owed to passengers on a ship by classifications of the persons on the ship, . . . reference to the general premises liability duties in South Carolina [is] helpful."). When federal maritime law applies, the state law "is preempted by federal maritime tort law." State of Md. Dep't of Nat. Res. v. Kellum, 51 F.3d 1220, 1228 (4th Cir. 1995) (citing Pope & Talbot, 346 U.S. at 410); see also Byrd, 657 F.2d at 617 ("A state law, even though it does not contravene an established principle of admiralty law will, nevertheless, not be applied where its adoption would impair the uniformity and simplicity which is a basic principle of the federal admiralty law." (citing Moragne v. States Marine Lines, Inc., 398 U.S. 375, 402 (1970))). "However, if there is no admiralty rule for a particular issue, the court looks to state law to supply the rule of decision." Holt v. Brown, 185 F. Supp. 3d 727, 734 (D.S.C. 2016) (citing Byrd, 657 F.2d at 617). "This rule is especially true in negligence causes of action." Schumacher, 850 F. Supp. at 447. Thus, when considering negligence claims under maritime law, courts within this district have on occasion chosen to supplement their analysis with state law, finding that maritime law does not address all of tort law. See Holt, 185 F. Supp. 3d at 734–35 (applying South Carolina negligence law); Tisdale v. Teleflex, Inc., 612 F. Supp. 30, 40 (D.S.C. 1985) (applying South Carolina strict liability law for "expedien[cy]" because it did not vary from federal maritime law). The court finds that since the parties agree that

maritime law does not account for all aspects of negligence relevant to this case, it is

reasonable to incorporate defendants' arguments on control.  Second, based on the court's

own research, courts analyzing duties under maritime law have previously examined

control as a factor for imputing a duty on a defendant.  Cf. Sheeran v. Blyth Shipholding

S.A., 2017 WL 1157847, at *5–6 (D.N.J. Mar. 27, 2017) (analyzing whether the

administrative company owned by the plaintiff's employer owed a duty to exercise

reasonable care based on whether it controlled, managed, or supervised the stevedoring

and longshoring operations of the employer); Ehlman v. Northstar Marine, LLC, 2007

WL 528659, at *3 (W.D. Ky. Feb. 14, 2007) (analyzing whether the shipowner had

control over the vessel at the time of injury); Hamilton v. Marine Carriers Corp., 332 F.

Supp. 223, 228 (E.D. Pa. 1971) (analyzing whether a shipowner had control over the pier

such that it was liable for negligence).  Accordingly, the court addresses whether the Tall

Ships entities sufficiently exercised control such that they either owed a duty as a

shipowner pro hac vice under maritime law or owed a duty under complementary state

law, ultimately finding that they did not owe a duty under either definition of control.

### 1.  Control

Defendants argue that they possessed "no authority to direct or alter the

conditions on the Libertad." Id. at 15.  It is undisputed that defendants, in organizing the

festival, did not own or lease the Libertad.  Under maritime law, an "'owner pro hac vice'

of a vessel is 'one who stands in the place of the owner for the voyage or service

contemplated and bears the owner's responsibilities, even though the latter remains the

legal owner of the vessel.'"  McAleer v. Smith, 57 F.3d 109, 112 (1st Cir. 1995) (quoting

Matute v. Lloyd Berm. Lines, Ltd., 931 F.2d 231, 235 n.2 (3d Cir. 1991) (other

quotations omitted)).  "In effect, for liability purposes, an owner pro hac vice is treated as a shipowner."  Id. (citing Reed v. The Yaka, 373 U.S. 410, 412–13 (1963)).  The relationship necessary for application of the doctrine of ownership pro hac vice is ordinarily that of a charterer and shipowner, and such a relationship is not present here. Rao v. Hillman Barge & Constr. Co., 467 F.2d 1276, 1277 (3d Cir. 1972).

Similarly, under South Carolina law, a person or entity who operates an establishment but is neither an owner nor a lessee may nonetheless have a duty to exercise reasonable care to maintain safe premises.  Dunbar v. Charleston & W.C. Ry. Co., 44 S.E.2d 314, 317 (S.C. 1947).  Liability in such a situation depends upon control of the premises, not necessarily ownership.  See Miller v. City of Camden, 494 S.E.2d 813, 815 (S.C. 1997); Nesbitt v. Lewis, 517 S.E.2d 11, 14 (S.C. Ct. App. 1999).  When deciding whether an individual has exercised such control of the premises so as to impose a duty to reasonably inspect the premises, a court is to consider the individual's "power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee the management of the property."  Benjamin v. Walmart Stores, Inc., 413 F. Supp. 2d 652, 656 (D.S.C. 2006) (applying South Carolina law).  However, this rule typically applies to an employee or agent who has a duty to inspect the premises for dangerous conditions.  Here, even if the rule could be applied to defendants as event organizers, the evidence clearly suggests that they exercised no control over the conditions on the Libertad.  Ellis testified that two Argentinian sailors assisted the passengers, including himself, off the Libertad.  ECF No. 58-6, Ellis Dep. at 39:5–15. Both Reginald Brown—a Tall Ships CHS employee—and defendants' corporate representative testified that they had no involvement with the disembarkation process

because the Libertad and its crew were solely responsible for the operations on the vessel. See ECF No. 58-2, Brown Dep. at 40:3–13 ("Something about the LIBERTAD that was run with 300 cadets on board, they pretty much took care of everything themselves."); id. at 40:14–18 (noting that no one from the Tall Ships entities, to Brown's knowledge, inspected the gangways of the Libertad); ECF No. 58-4, Short Dep. at 24:1–6 ("Usually, when it comes to foreign military vessels, they prefer using all of their own equipment; so if there were stairs or a gangway, it would have been my -- according to my understanding, it would have been something that they provided for themselves."). While defendants employed "liaison officers" who attended to the needs of each ship, the liaison officers were not responsible for docking or gangways.  ECF No. 58-1 at 3 (citing Short Dep. at 17:19–18:2).  The parties further confirmed at the hearing that the gangway was owned by the Libertad, rather than by the Tall Ships entities.  Plaintiffs argue that under Appendix B of the Agreement, Tall Ships CHS agreed to provide certain services, including "m. gangways and/or boarding ramps to permit safe boarding of the Participating Vessels that will be in accordance with Coast Guard standards."  ECF No. 64-2 at 20–21.  However, the terms of the Agreement do not alter the fact that the Libertad ultimately provided its own gangway, and, as the court discusses below, plaintiffs had no privity of contract with either of the Tall Ships entities.  Given the evidence before the court, the court concludes that no reasonable juror would find that defendants exercised any degree of control over the deck of the Libertad or the bitt and gangway used by Ellis to cross onto the pier.

### 2. Contracts

Plaintiffs do not argue that in the absence of the shipowner in this lawsuit, the Tall Ships entities should stand in the place of Argentina because they exercised control over the Libertad.  Instead, plaintiffs present four arguments in response: (1) Defendants owed plaintiffs a duty based upon a contracts theory; (2) Tall Ships CHS owed a duty to plaintiffs as a possessor of land; (3) Defendants owed plaintiffs a duty under § 51 of the Third Restatement of Torts, which governs duties to entrants on land; and (4) even if defendants had no duty, they independently assumed liability for any negligence involving the Libertad.  Of these arguments, the court finds that only the first argument purportedly reflects maritime law, so the court will address the first argument before turning to the remaining arguments in the following section, focused on state law.

Plaintiffs argue that defendants owed a duty to plaintiffs based upon the theory of contracts under both maritime and South Carolina law.  Specifically, plaintiffs argue that there are two contracts that evince defendants' intention to protect festival participants: (1) the Agreement between Tall Ships CHS and Tall Ships American, and (2) the purchase of the tickets.

Plaintiffs are correct that in certain circumstances, courts recognize a duty arising out of contract under maritime law.  See, e.g., Price v. Atl. Ro-Ro Carriers, 45 F. Supp. 3d 494, 507 (D. Md. 2014) (analyzing whether commercial manager's contract with the vessel owner gave rise to a duty); Menard v. LLOG Exploration Co., LLC, 259 F. Supp. 3d 475, 482 (E.D. La. 2017) (analyzing whether time charterer's contract with the vessel owner gave rise to a duty).  In such instances, however, the critical inquiry is whether the contract in question was made for the benefit of the plaintiff as a third party.  See

Restatement (Second) of Contracts § 302 (1981) (recognizing that contracting parties may create rights in favor of a non-contracting third party by manifesting an intention to do so); In re Frescati Shipping Co., Ltd., 718 F.3d 184, 198 (3d Cir. 2013), as amended (July 12, 2013) ("We typically look to the Restatement of Contracts for the federal law on third-party beneficiaries."). Specifically, a third party may be a beneficiary to a contract of others where it is "appropriate to effect[] the intention of the parties," and "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302(1)(b); cf. Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993) (holding that a third-party beneficiary to a charter "must show that 'the parties to that contract intended to confer a benefit on [it] when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to [it]'" (quoting McPheeters v. McGinn, Smith & Co., 953 F.2d 771, 773 (2d Cir. 1992) (alterations in original)).

Here, plaintiffs point to the Agreement between Tall Ships American and Tall Ships CHS, which denotes the Tall Ships entities' obligations to each other. Critically, however, the Agreement was only between those two entities. Plaintiffs fail to point to any express statement in the Agreement that names the visitors to the festival as intended beneficiaries. They further fail to point to any contract between the Tall Ships entities and Argentina that would theoretically provide that the Tall Ships entities assumed a degree of control over the operations of the Libertad. Instead, plaintiffs merely argue that the Tall Ships entities agreed to undertake general responsibilities in organizing the festival to ensure safety at the port, but such provisions do not directly indicate an intent

12

to benefit third parties.  As just one example, plaintiffs highlight that under Appendix A, § 5(h), the Agreement provides that "Tall Ships America will provide professional review for Port Organizer's public safety, security and incident management plan, and specify changes to same as may be necessary to ensure conformity with MENS and other public safety stakeholder requirements."  ECF No. 64-2 at 18.  Plaintiffs suggest that the Tall Ships entities thus contracted to provide for public safety, and even if the Libertad provided its own safety precautions, the Tall Ships entities still owed a duty to ensure those precautions met certain requirements.  The issue is that, as written, the Agreement, at most, only establishes a duty owed by Tall Ships America to Tall Ships CHS to provide safety review, but the Agreement cannot be used to infer a duty owed to Ellis, a third party.  The case cited by plaintiffs, Gehlken v. McAllister Towing & Transportation Co., 2007 WL 2332487 (D.S.C. Jan. 29, 2007), is not authority to the contrary.  In Gehlken, the defendant and the plaintiff's employer entered into an agreement that provided that the defendant would repair a tugboat that belonged to the plaintiff's employer at its shipyards and would safely secure the tug to the dry dock.  First, Gehlken does not stand for the proposition that a duty arises out of contract, as the court merely observed the existence of an agreement.  Id. at *8.  Instead, the court's analysis was based on the principle that "[a] duty of care exists when injury is foreseeable."  Id.  It determined that the defendant owed a duty as a dry-dock operator because the act of throwing a "monkey's fist" from the dry dock to the tug without proper warning could foreseeably cause injury.  Id.  Second, had the duty turned on the existence of a contract in Gehlken, the case would be distinguishable because the agreement in Gehlken was between the dock operator and the ship owner.  Third, it is doubtful that the plaintiff in

<u>Gehlken</u> was a beneficiary in the contract between the defendant and the plaintiff's employer such that it would supply the rule extending contracts to third-party beneficiaries that plaintiffs cite it for.

Alternatively, plaintiffs argue that South Carolina law "also recognizes that a contractual relationship can impose a duty of care." ECF No. 64 at 13. The court disagrees, finding that South Carolina common law provides no avenue for arguing that a duty may exist through contract absent a special relationship. "In most instances, a negligence action will not lie when the parties are in privity of contract." <u>Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.</u>, 463 S.E.2d 85, 88 (S.C. 1995). Instead, if there is "a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action." <u>Id.</u> (citing <u>S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.</u>, 346 S.E.2d 324 (S.C. 1986)). However, plaintiffs have failed to point to a special relationship arising out of contract between the Tall Ships entities and plaintiffs that formed the basis for a duty. First, plaintiffs point again to the Agreement, which is only between the Tall Ships entities. But like federal law, South Carolina law provides that "policy guidelines and contracts to which plaintiff was not a party could not form the basis of a duty to support plaintiff's negligence claim." <u>See</u> <u>Big Red Box, LLC v. Square, Inc.</u>, 2020 WL 465928, at *14 (D.S.C. Jan. 22, 2020) (collecting South Carolina cases). To further underscore this point, defendants point to a provision in the Agreement specifying that there were "no third party beneficiaries" created by the Agreement. ECF No. 66 at 2. In short, it is clear that a third person not in privity of contract may only be a third-party beneficiary "if the contracting parties intended to create a direct, rather than incidental or consequential,

benefit to such third person," and such was not the case here.  Goode v. St. Stephens

United Methodist Church, 494 S.E.2d 827, 833 (S.C. Ct. App. 1997) (citing Bob

Hammond Const. Co., Inc. v. Banks Const. Co., 440 S.E.2d 890, 892 (S.C. Ct. App.

1994)).

Plaintiffs also argue that the purchase of tickets by passengers like Ellis

constituted a contract in which Ellis was a direct beneficiary.  However, plaintiffs only

state generally that the purchase of tickets imbued Tall Ships CHS with a responsibility

"to protect Festival Participants like Jerry [Ellis]."  ECF No. 64 at 12.  Plaintiffs fail to

specify how the purchase of tickets created a contract, where such a contract, if any, was

outlined, and the terms of any such contract.  Moreover, plaintiffs have presented no

evidence that defendants specifically indicated to visitors that they assumed responsibility

for the conditions on the featured ships, such as via print on physical tickets or on their

website.  Defendants instead represent that the patrons were only given a wristband and a

pamphlet, and neither provided any "express or implied obligations."  ECF No. 66 at 5.

Because plaintiffs provide no other argument to show the existence of a duty owed by

defendants under contract, the court finds that defendants owed no duty under the law in

this respect.

### 3.  Coast Guard Standards

Finally, plaintiff argue in their supplemental brief that United States Coast Guard

Navigation and Vessel Inspection Circular No. 2-00 ("NVIC 2-00") applied to the

Libertad while the Libertad was at the festival.  NVIC 2-00 "provides guidance for the

inspection of vessels operating as registered participants in Marine Events of National

Significance."  ECF No. 71 at 6.  There is no dispute that the tall ships festival may be

15

deemed a Marine Event of National Significance.  Plaintiffs proceed to argue that under the Agreement, Tall Ships CHS was obligated to ensure that the Libertad complied with all Coast Guard standards, including NVIC 2-00.  Although defendants dispute the applicability of NVIC 2-00, arguing that it merely provides general guidance for a Coast Guard inspector to identify areas of concern, defendants largely agree that certain standards within NVIC 2-00 were not met.  See ECF No. 72 at 8 ("Tall Ships will acknowledge that if someone from the Coast Guard saw passengers using the bitt/bollard to exit the Libertad, they would have raised that as a potentially hazardous method of disembarkation.").

Nevertheless, plaintiffs' argument faces the same flaw as before.  Plaintiffs suggest that NVIC 2-00 creates a duty because Tall Ships CHS agreed via contract to abide by the standards set forth in the guidance.  But again, plaintiffs are not a party to the Agreement between Tall Ships American and Tall Ship CHS.  Moreover, plaintiffs cite no case—and the court can identify none[3]—that held that the Coast Guard Navigation and Vessel Inspection Circular independently provides a duty of care owed to passengers.  Indeed, as defendants point out, NVIC 2-00 provides guidelines for best practices, but it does not carry the force of law.  See ECF No. 71 at 6; Shipbuilders Council of Am. v. U.S. Dep't of Homeland Sec., 770 F. Supp. 2d 793, 808 (E.D. Va. 2011) ("[T]he Coast Guard has made clear that Navigation and Vessel Inspection Circulars . . . are issued only for the purpose of providing general guidance and 'do not have the force of law.'" (quoting United States Coast Guard website)).

---

[3] Cases like Queen of Hearts Cruises, Inc. v. United States, 1999 WL 195298, at *7 (S.D.N.Y. Apr. 7, 1999), are distinguishable because there, the NVIC was used as a "source[] for a duty" for the United States Coast Guard itself, not a private entity.

Since defendants were not "shipowners" and did not act as shipowners <u>pro hac vice</u>, defendants owed no duty to plaintiffs under maritime law, and they did not assume a duty under contract—under either maritime law or South Carolina law. This conclusion alone supports the court's decision to grant summary judgment in defendants' favor. Nevertheless, as explained below, even if this conclusion were not dispositive, and the court considers the existence of a duty under South Carolina law, the court would grant the motion for summary judgment based on defendants' remaining arguments.[4]

## B.  South Carolina Law

The court determined above that the law on duty under maritime law was established enough to grant summary judgment on plaintiffs' negligence claim. Plaintiffs argue, however, that additional state law considerations are relevant, including the law on premises liability, the law under the Restatement of Torts, and the common law on affirmative duties to warn or act. Defendants similarly argue that if the court looks to South Carolina law, defendants would still succeed on the merits of their motion for summary judgment. Since both parties seek to advance arguments under South Carolina law, the court considers plaintiffs' arguments below.[5]

---

[4] As discussed above, defendants argued that assuming they possessed a duty, they could not have breached such a duty because the bitt presented an open and obvious danger. Under admiralty law, a defendant does not breach the duty of ordinary care if a condition was an open and obvious danger; in other words, an owner "has a duty to warn passengers about only latent dangers." <u>Harrison v. Newman</u>, 2017 WL 4386411, at *2 (D.S.C. Sept. 29, 2017) (quoting <u>Marin v. Myers</u>, 665 F.2d 57, 58 (4th Cir. 1981)). Since the court concluded that the Tall Ships entities did not owe Ellis a duty with regard to the conditions on the Libertad, this issue is not material to the court's decision to grant summary judgment in Tall Ships' favor, and the court does not consider it.

[5] As another basis for considering state premises liability law in a maritime case, other courts have determined that because maritime law does not impose a duty on a dock owner or its equivalent to provide a means of safe ingress or egress, absent a maritime

First, plaintiffs ask the court to find that defendants owed plaintiffs a duty "as a possessor of land" under South Carolina common law and § 343 of the Restatement of Torts.  ECF No. 64 at 14.  Specifically, plaintiffs argue that Tall Ships CHS was the "possessor of . . . Pier Zulu" and was responsible for harm caused to business visitors. ECF No. 64 at 15.  Plaintiffs further aver that defendants owed a duty to account for the pier's natural condition—"the tide's negative impact on the gangway"—and its artificial condition—the lack of stairs to disembark, which necessitated the Libertad's use of a bitt to disembark visitors.  ECF No. 64 at 15.  Defendants do not dispute that they exercised a certain degree of control over the pier during the tall ships festival.  Nevertheless, plaintiffs' argument is unavailing.  To establish negligence in premises liability, a plaintiff must similarly prove control over the premises where the accident occurred.  See Miller, 494 S.E.2d at 815 ("One who controls the use of property has a duty of care not to harm others by its use.  Conversely, one who has no control owes no duty.") (citations omitted); S.C. Farm Bureau Mut. Ins. Co. v. S.E.C.U.R.E. Underwriters Risk Retention Grp., 554 S.E.2d 870, 875 (S.C. Ct. App. 2001) ("The responsibility for an injury negligently caused by a defect or dangerous condition or activity in or on real property usually attaches to the owner or possessor, by virtue of his control thereof . . . ." (quoting 62 Am. Jur. 2d Premises Liability § 4, at 351 (1990))).  Since there is no factual dispute that the slip-and-fall occurred either on the deck of the ship, the bitt, or the Libertad's gangway, defendants' status as possessors of the pier is immaterial.  Certainly, it is conceivable that the Tall Ships entities could have done more to make the disembarkation

---

status between the parties, such a duty must be defined by applicable state law.  See, e.g., Bradshaw v. Unity Marine Corp., Inc., 147 F. Supp. 2d 668, 671–72 (S.D. Tex. 2001).

process for all of the ships, including the Libertad, less difficult, but they were not required to do so if no duty was owed.  Ultimately, for reasons discussed above, there is no genuine dispute of material fact that the Tall Ships entities' control of the pier ended at the dock and the Argentine crew's control began at the gangway of the ship.

Next, plaintiffs argue that the Tall Ships entities owed plaintiffs a duty under § 51 of the Restatement of Torts.  However, that section merely clarifies that under the duty as a landowner in § 343, the fact that a dangerous condition is open and obvious reflects whether the landowner used reasonable care, but it does not completely avoid the landowner's liability.  This section alone does not establish an independent duty.  Since the court determined that it need not consider the open and obvious doctrine under either maritime law or South Carolina law because defendants have established that they owed no duty of care, plaintiffs' argument ultimately fails to move the needle.

Finally, plaintiffs argue that under South Carolina law, even if defendants were not responsible under premises liability, they were nonetheless negligent for failing to control Argentina's conduct or to warn Ellis of danger.  "Under South Carolina law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger."  Faile v. S.C. Dep't of Juv. Just., 566 S.E.2d 536, 546 (S.C. 2002).  South Carolina recognizes five exceptions to this rule: "1) where the defendant has a special relationship to the victim; 2) where the defendant has a special relationship to the injurer; 3) where the defendant voluntarily undertakes a duty; 4) where the defendant negligently or intentionally creates the risk; and 5) where a statute imposes a duty on the defendant."  Doe v. Wal-Mart Stores, Inc., 711 S.E.2d 908, 911–12 (S.C. 2011) (citing

id.).  Plaintiffs argue that the first, second, third, and fourth exceptions apply.  The court considers each in turn, ultimately finding that none of the exceptions applies.

First, as discussed earlier, there is no evidence that defendants had a special relationship with plaintiffs or any visitors of the festival concerning their safety.  This exception typically applies to special professional relationships like those between a doctor and patient or employer and contractor.  See, e.g., McCord v. Laurens Cnty. Health Care Sys., 838 S.E.2d 220, 296 (S.C. Ct. App. 2020) (describing special relationship doctrine).  One could contemplate a scenario where defendants indicated that they would care for their visitors' safety based on representations made on the website or printed on the tickets, but plaintiffs have presented no such evidence.  Therefore, the first exception does not apply.

The second exception concerns a theoretical special relationship between defendants and Argentina, as the alleged injurer.  "The defendant may have a common law duty to warn potential victims under the 'special relationship' exception when the defendant 'has the ability to monitor, supervise, and control an individual's conduct' and when 'the individual has made a specific threat of harm directed at a specific individual.'"  Id. at 912 (citing Doe v. Marion, 645 S.E.2d 245, 250 (S.C. 2007)).  It is possible that defendants had the ability to monitor, supervise, and control Argentina's conduct as it related to the Libertad while its ship was at the festival.  Critically, however, plaintiffs fail to establish the second prong of the exception, as there is no evidence that Argentina specifically threatened to harm Ellis.  Therefore, this exception does not apply.

Third, "[u]nder the common law, even where there is no duty to act but the defendant voluntarily undertakes the act, the defendant assumes a duty to use due care."

Jackson v. Swordfish Invs., L.L.C., 620 S.E.2d 54, 56 (S.C. 2005) (citing Russell v. City of Columbia, 406 S.E.2d 338, 339 (S.C. 1991)). The court does not find that anyone other than the crew members of the Libertad affirmatively acted to aid Ellis. According to a translated report written by Argentina prior to its dismissal from the case, the Libertad's safety measures provided that "during visiting hours, 'guadamancebos' (personnel) will be positioned on both landing stages. They will assist with the boarding of the visitors, [e]specially . . . the elderly" with the understanding that the "guadamancebos are the personnel that aid and assist with boarding and disembarking." ECF No. 66-3 at 4. It is possible to construe this evidence as the Libertad undertaking the act of implementing safety measures and therefore assuming the duty to do so with care. No similar evidence exists with respect to defendants.

Plaintiffs argue that defendants affirmatively acted and assumed a duty because they had "specific knowledge . . . about the tide's impact on a participating tall ships' gangway and . . . about the dangers of using a bit as a step." ECF No. 64 at 18. However, plaintiffs cite no cases supporting the notion that mere knowledge translates to an undertaking. Instead, the plaintiffs cite to several cases that are inapposite. For example, Rygg v. County of Maui, 98 F. Supp. 2d 1129 (D. Haw. 1999) applied Hawaiian law and is not controlling. Furthermore, to the extent that the Rygg court's analysis is persuasive, plaintiffs have failed to prove that the risk presented by the gangway was as foreseeable to the Tall Ships entities as the risks were to the defendants in Rygg. See id. at 1135 (describing telephone poles and large logs that were regularly seen by the defendant in the ocean). Similarly, Ravins v. Alvarez, 2004 WL 5642455 (C.D. Cal. July 29, 2004) is distinguishable in that it involved an actual affirmative

undertaking by the defendant.  In <u>Ravins</u>, the victim was considering a motorboat ride and contacted the defendant, the harbormaster, asking for advice on the weather.  The defendant failed to warn the victim of the risks, despite knowing he was a novice.  Critically, in <u>Ravins</u>, the court found that the harbormaster's duty stemmed from a coupling of both his knowledge of the victim's novice status <u>and</u> his answering of the call.  Here, the court fails to see when defendants voluntarily undertook similar assistance to Ellis before he was injured on the Libertad.  Plaintiffs also cite <u>Wolf v. Celebrity Cruises, Inc.</u>, 101 F. Supp. 3d 1298 (S.D. Fla. 2015), <u>aff'd</u>, 683 F. App'x 786 (11th Cir. 2017).  However, <u>Wolf</u> appears to support defendants' position, as the Southern District of Florida specifically found that the defendant, a cruise line, had no duty to warn because it was not on notice of any unsafe conditions beyond the port where it was docked.  <u>Id.</u> at 1307.  Finally, plaintiffs cite a South Carolina case, <u>Miller v. City of Camden</u>, for the proposition that the issue of whether one assumed a voluntary undertaking is a question for the jury if more than one inference can be drawn from the evidence.  494 S.E.2d at 815.  <u>Miller</u> fails to support plaintiffs' position, however, because there is no genuine dispute of material fact that defendants were not volunteers that assumed a duty.  Even in the light most favorable to plaintiffs, the evidence supports only one conclusion, which is that Argentina "pretty much took care of everything themselves."  Brown Dep. at 40:3–13.

Finally, a "common law duty may arise where a defendant creates 'a situation that [it] knew or should have known posed a substantial risk of injury' to a plaintiff."  <u>In re Blackbaud, Inc., Customer Data Breach Litig.</u>, 2021 WL 4866393, at *9 (D.S.C. Oct. 19, 2021).  The court previously discussed how the evidence indicates that the Libertad's

crew members were solely responsible for the conditions on the ship and the gangway. At most, plaintiffs can only show that defendants acknowledged "the need to make sure Festival participants were safe while at the Festival," ECF No. 64 at 22, but there is no evidence that they created the risk aboard the Libertad since they did not have a duty to approach or inspect the gangway and ultimately did not do so. Therefore, this exception does not apply, and the court finds no basis for imputing a duty upon defendants to warn Ellis of any danger.

The court finds that summary judgment is warranted under both of defendants' arguments. Specifically, there is no genuine dispute of material fact as to (1) whether the Tall Ships entities owed a duty of care under maritime tort law because it was not a shipowner and did not otherwise assume a duty under a theory of contracts, and (2) whether the Tall Ships entities owed a duty of care under principles of South Carolina law. Defendants' success on either argument alone warrants summary judgment in their favor, and therefore, the court finds summary judgment appropriate in defendants' favor.

## IV. CONCLUSION

For the reasons set forth above, the court **GRANTS** the motion.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 24, 2022**
**Charleston, South Carolina**

23